ENTERED ON THE DOCKET
DATE: 7-7-94

U.S. _____ COURT
DIST _____

JUL 7  4 27 PM '94

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

BY W. Conner _____ TY

```
LEWIS "TOBY" TYLER,            )
                               )
                Plaintiff,     )
                               )      CIVIL ACTION
        v.                     )
                               )      Case No. 93-4030-DES
CITY OF MANHATTAN,             )
                               )
                Defendant.     )
                               )
_____)
```

## MEMORANDUM AND ORDER

This matter was tried to the court on April 25-26, 1994. Following the trial, the parties were directed to submit proposed findings of fact and conclusions of law. The court has considered the evidence, the arguments of counsel, the parties' proposed findings of fact and conclusions of law, and their responses. The court is now prepared to rule.

## FINDINGS OF FACT

1. Plaintiff Toby Tyler uses a wheelchair. The entire right side of his body is paralyzed from head to toe. His disability is the result of a 1982 gunshot wound to the head while he was on duty as a patrol officer in Brookfield, Wisconsin. As a result of his disability, he is essentially unable to read. Although he uses a wheelchair, he is able to use handicapped-accessible public restrooms without assistance.

2.   Plaintiff moved to Manhattan, Kansas, with his wife Vicki Tyler in 1987, after he retired from the Brookfield Police Department.   He presently resides in the City of Manhattan ("City").

3.   Plaintiff is not employed.

4.   Plaintiff is active in civic affairs and regularly attends meetings of the City Commission and the Municipal Airport Advisory Committee.

5.   Beginning in the fall of 1991, Mr. and Mrs. Tyler initiated contacts with officials of the City of Manhattan expressing their concerns about the lack of handicapped-accessible parking throughout the city.

6.   Unsatisfied with the responses they received from city officials, Mr. and Mrs. Tyler filed a complaint with the Kansas Attorney General's Office on January 27, 1992.   The Attorney General's Office in turn contacted James R. Pearson, then Assistant City Manager of the City of Manhattan, noting the requirements of the Americans with Disabilities Act (ADA) that had taken effect January 26, 1992, as well as state law requirements regarding handicapped-accessible parking.

7.   On January 26, 1992, the City published a notice in the local newspaper stating its intent to comply with the ADA in the provision of services and programs to the public.   The notice designated Cornell Mayfield, Director of the Department of Human Resources, to coordinate its efforts to comply with the ADA.   The public notice was also sent to local radio stations.

2

8.   On January 28, 1992, city staff made a presentation to the City Commission concerning the ADA.   Its purpose was to inform the Commission about the ADA and its impact on the City of Manhattan.

9.   On February 18, 1992, James Pearson responded to the letter from the Attorney General's Office concerning the Tylers' complaint by assuring that the City Commission and staff were totally committed to complying with the ADA.

10.   Vicki Tyler filed a second complaint with the Attorney General's Office on March 12, 1992, again citing a lack of handicapped-accessible parking.

11.   In response to this complaint, at the request of Mr. and Mrs. Tyler, James Pearson met with Mr. Robert Burke, a representative of Access USA.    Access USA is an advocacy organization for disabled persons.   As a result of this meeting, the City agreed in May 1992, to make numerous revisions to handicapped parking spaces at city facilities.   The City agreed to accomplish the changes by July 1, 1992.   The Attorney General's Office considered the Tylers' complaint resolved by this agreement.

12.   Sometime after July 1, 1992, the Tylers contacted the Attorney General's Office and stated that all of the agreed modifications had not been accomplished by the deadline.   They were advised that they could hire private counsel to pursue the matter, and that if they elected to do so the Attorney General's Office would not proceed further.   The Tylers later notified the Attorney

3

General's Office that they had retained private counsel to pursue the matter.

13.   In early 1992, after the effective date of the ADA, meetings of the Municipal Airport Advisory Committee were held at a privately owned restaurant that was not wheelchair-accessible without assistance.   After plaintiff informed city officials that the restaurant was inaccessible, the meeting location was changed to another restaurant.   Although the second restaurant had an accessible entrance for persons using wheelchairs, its threshold posed a barrier to access.   Inside the building, steps separated the meeting location from the restrooms.   In addition, restrooms were inaccessible without first asking permission of a restaurant employee.   Plaintiff again spoke to city officials about the meeting location.   Thereafter, the meeting location was changed to a third restaurant.   The interior of the restaurant where meetings are currently held is accessible.   However, the single handicapped parking space in the parking lot of the restaurant is not marked with pavement striping.   If insufficient space is left by a vehicle parking adjacent to plaintiff's vehicle, he is unable to access his car in his wheelchair.

14.   On April 29, 1992, plaintiff sent a letter to Mr. Curtis Mayfield requesting that agendas and information packets for City Commission meetings be made available on audio tape at the city library.   On May 1, 1992, Mr. Mayfield responded by letter, indicating that the agenda would be on file in both regular and large print at the city library, and the City was taking steps to

4

provide the materials in audiotape format upon request if a person needs such an accommodation. About three months later, the City began recording City Commission agendas on microcassette audiotape. The audiotaped agenda is placed in the city library with a tape player and is accessible to any interested person.

15. The packet of documents accompanying the City Commission meeting agenda is placed on file at the city library for public review. The City has not attempted to transfer the packet materials to audiotape. The packets are typically about one inch thick, and may include irregular documents such as maps and plats in addition to lengthy reports. It would be impracticable to translate all such materials to audiotape format in a timely fashion prior to City Commission meetings, which are held biweekly.

16. Plaintiff has requested that the city provide an audiotaped index or list of the materials in the agenda packet as an alternative to transferring all such materials themselves to audiotape. Mr. Pearson refused this request, citing lack of personnel.

17. On June 2, 1992, the City of Manhattan submitted an application to the state of Kansas requesting $264,000 in funding from the Small Cities Community Development Block Grant Fund for the purpose of financing handicapped accessibility improvements at city-owned facilities. The amount requested was to be matched with city funds.

18. The Mayor of the City of Manhattan, with the approval of the City Commission, appointed an eight-member ADA Committee on May

5

19, 1992. James Pearson was appointed to serve as staff liaison to the Committee. The purpose of the Committee was to advise the City Commission and City Manager to assure compliance with Titles II and III of the ADA and related Kansas statutes; to assist the City Commission in identifying barriers to persons with disabilities in public facilities and programs for inclusion in the City's ADA transition plan; and to make recommendations for expenditure of budgeted funds for the purpose of removing identified barriers in public facilities and programs.

19. At its first meeting on June 4, 1992, the ADA Committee was presented with a transition plan drafted by city staff. Also provided to the Committee was a list of buildings owned by the City of Manhattan and the estimated cost of improvements anticipated to be necessary for several city facilities.

20. The ADA Committee was also provided a copy of the City's proposed "ADA Services and Programs Policy." The expressed purpose of the proposed policy was to insure that each city service, program, and activity operates in such a manner that, when viewed in its entirety, it is readily accessible to and usable by persons with disabilities. The policy designates the Department of Human Resources as the agency responsible for compliance with the ADA and parallel state laws, including the processing of official complaints.

21. The ADA Committee met again on June 11, 1992. The Committee discussed the proposed ADA Services and Programs Policy statement and reviewed the draft transition plan. The Committee

6

was informed that the City had adopted a grievance procedure for the resolution of complaints against the City regarding compliance with Title II of the ADA. Under the grievance procedure, complaints are to be submitted in writing, addressed to Mr. Cornell Mayfield, Director of Human Resources. The Committee members were asked to prioritize the transition plan and identify additional barriers before the next meeting.

22. The ADA Committee next met on June 25, 1992. The Committee discussed and approved the proposed ADA Services and Programs Policy, and decided that copies of the policy should be distributed to all city employees. The Committee also discussed the transition plan and unanimously prioritized the list of facilities needing modifications or improvements in order to comply with the ADA. The Committee discussed each facility individually, identifying specific barriers in each that needed to be addressed. The Committee also discussed barriers in other public facilities, including the leased building that houses Municipal Court.

23. On July 2, 1992, a summary of the amended transition plan was distributed to 44 organizations and entities representing persons with disabilities. It was also mailed to certain individuals, including the Tylers. The summary listed each city facility identified by the Committee in priority order, beginning with City Hall, and for each facility listed the improvements deemed necessary by the Committee. The summary also identified a need for curb ramps throughout the community to provide access to

7

public accommodations.   However, the plan did not include a schedule for installation of curb ramps.

24.   Transition plan documents were also made available for public review in the City Clerk's Office, the City Manager's Office, and the Manhattan Public Library.   Interested persons were invited to attend the next ADA Committee meeting on July 15, 1992, to present comments on the plan.

25.   On July 15, 1992, a public hearing was held on the transition plan.   Vicki Tyler attended the public hearing and made several comments on the transition plan.   After further discussion following the public hearing, the transition plan was approved by a vote of the ADA Committee.   Although official action was taken to finalize the transition plan, a final version of the plan was never formally prepared by city officials.

26.   The City recognized that the regulations implementing the ADA called for the City to perform a self-evaluation.   In 1984 the City of Manhattan had performed a self-evaluation for purposes of complying with the regulations implementing § 504 of the Rehabilitation Act of 1973.   The 1984 evaluation included a comprehensive survey by city department heads of the physical accessibility of buildings and facilities then owned by the City of Manhattan.   It also included an evaluation of the City's recreational program for handicapped and senior adults, and the City's rental housing rehabilitation  program, both recipients of

8

federal financial assistance.[1]   The City had also prepared a transition plan in 1984 identifying necessary structural modifications to be made to City facilities in order to comply with the regulations implementing § 504.

27.  City officials deemed the 1984 self-evaluation to be sufficient to comply with the ADA's self-evaluation requirement. Consequently, no additional formal inspections of city facilities were conducted in 1992.   The City of Manhattan currently offers some programs and services that were not provided in 1984.   To address programs and services that have been added or changed since 1984, the City relies upon its ADA Services and Programs Policy statement.[2]

28.  In an effort to comply with the ADA's self-evaluation requirement, James Pearson developed a list of facilities owned or insured by the city.   In addition, city department heads and

---

[1]    The court notes with some consternation that the materials designated at trial and admitted into evidence as the 1984 self-evaluation (Plaintiff's Exhibits 2 and 2A) do not include a number of documents prepared in 1984 that were submitted by both parties as attachments to their summary judgment pleadings, and which the defendant argued it relied upon to comply with the ADA self-evaluation requirement. At trial, neither party admitted into evidence any document or set of documents designated as the 1992 self-evaluation.   Of course, the court may rely only on the evidence admitted at trial in determining this matter.   The documents submitted in support of the defendant's motion for summary judgment, which included a set of documents designated as the "ADA Self Evaluation," are part of the record of the case, but they are not part of its trial record.

[2]    Although the parties referred frequently at trial to the 1992 ADA self-evaluation, only the 1984 self-evaluation documents were admitted into evidence.  See supra note 1.

division chiefs were asked to review their facilities and identify architectural barriers for inclusion in the transition plan.

29. The self-evaluation process conducted in 1992 did not specifically address city services offered in buildings not owned by the City. For example, Municipal Court operations are housed in a facility leased by the City. In addition, the Municipal Airport Advisory Committee holds its meetings in restaurant facilities not owned by the City. These facilities were not evaluated because city officials believed they did not pose accessibility problems.

30. The City's 1992 self-evaluation process occurred *after* the ADA Committee approved the transition plan on July 15, 1992. The transition plan was finalized and approved by the ADA Committee prior to the July 26, 1992 deadline imposed by the federal regulations implementing the ADA.[3]

31. In July or August 1992, James Pearson was appointed City Manager of Manhattan.

---

[3]     The court notes that the plaintiff does not challenge the timeliness of either the self-evaluation or the transition plan. The implementing regulations promulgated by the Department of Justice require that public entities employing at least 50 persons must adopt a transition plan by July 26, 1992, if structural changes are undertaken to achieve program accessibility. See 28 C.F.R. § 35.150(d)(1). A self-evaluation is to be conducted within one year of the effective date of the regulations, which was July 26, 1991. See 28 C.F.R. § 35.105(a); see also 42 U.S.C. § 12134(a) (Department of Justice shall promulgate implementing regulations not later than one year after July 26, 1990). Therefore, the self-evaluation deadline for Title II entities was also July 26, 1992.
        The court has disregarded the unchallenged testimony of plaintiff's expert to the effect that the regulations impose a deadline of January 26, 1993, for the ADA self-evaluation. Although the defendant did not object to this testimony, it is inadmissible under Fed. R. Evid. 702 since it addresses not a factual issue, but rather a question of law.

32.  On August 21, 1992, the City was notified that its grant application for its architectural barrier removal program had been approved.  The grant amount was $264,000, to be matched with an equal amount from city general funds, for a total of $528,000.  The state grant funding was to be released October 1, 1992.  The City notified the members of the ADA Committee about the successful grant application, and also sent notice to Vicki Tyler.  The grant did not include funding for curb ramps.

33.  On September 15, 1992, plaintiff wrote a letter to James Pearson expressing his concerns that the audiotaped agendas were not available to him far enough in advance of the City Commission meetings.  He also indicated that insufficient time was available to allow the City Manager's office to convert to audiotape any information he might need from the packet accompanying the agenda. The letter included an attachment demanding city action on handicapped-accessible parking, curb ramps, review of city codes for compliance with the ADA, a plan for implementing suggestions by the public on compliance issues, and inspection of a private restaurant for possible code violations.

34.  On September 16, 1992, plaintiff spoke with Cornell Mayfield and requested a form for the purpose of filing an ADA complaint.

35.  On September 17, 1992, plaintiff, accompanied by Vicki Tyler, met with James Pearson in his office.  They expressed concerns about the inaccessibility of certain city ball fields. Pearson agreed a problem existed and said the City would fix it.

11

Plaintiff also requested that the threshold of the front entrance to City Hall be modified to allow wheelchair access.    Pearson responded that he was unable to do so because of lack of money. When plaintiff offered to help pay the cost, Pearson responded that if the City altered the threshold as the Tylers requested, plaintiffs would then want something else.    Plaintiff also complained at this meeting that there was no handicapped-accessible parking near the front entrance to City Hall.

36.   On September 18, 1992, James Pearson sent a memorandum to all city employees regarding the ADA, along with a copy of the ADA Services and Programs Policy approved by the ADA Committee.    The memorandum emphasized the City's responsibility to make its services accessible to all residents and to accommodate the special needs of every individual.  The ADA Services and Programs Policy is broadcast weekly in a one-minute public service announcement regarding participation in the City's programs and services.

37.   On October 1, 1992, in response to plaintiff's request, Mr. Cornell Mayfield sent the Tylers printed copies of the City's ADA Services and Programs Policy and a printed copy of the ADA Grievance Procedure, along with a complaint intake form for filing a complaint.

38.   Plaintiff testified he was unable to read the grievance procedure and no one had ever read the procedure to him.  He did not ask the City to provide the materials in large print, on audiotape, or in some other alternative medium he could understand.

12

39.  Plaintiff is unable to submit a complaint in writing without assistance.  He did not seek help from the City in order to file an ADA grievance.  He did not ask his wife to help him file a grievance.  Vicki Tyler testified that after they found out they would have to file a grievance with Cornell Mayfield, they declined to file one.

40.  The City's ADA grievance procedure does not require a grievance to be filed as a prerequisite to seeking other remedies for violation of the ADA.

41.  On October 20, 1992, James Pearson responded by letter to plaintiff's letter of September 15 and the concerns he raised in the meeting on September 17.  Mr. Pearson explained that his office was short-handed due to illness and therefore could not immediately respond to his request regarding audiotaped City Commission agendas.  He also explained that the City was responding as quickly as its resources would allow to the five issues raised in the plaintiff's letter.  Mr. Pearson assured plaintiff that the City was committed to accessibility for persons with disabilities and would move ahead as quickly as possible to implement necessary changes.

42.  The City Commission scheduled a regular meeting for November 3, 1992.  The City Commission meets on the second floor of City Hall.  On the date of the meeting, the sole elevator allowing wheelchair access to the second floor malfunctioned and was not in operation at the time of the meeting.

13

AO 72A

43.  Plaintiff and Vicki Tyler arrived at City Hall to attend the City Commission meeting.  Vicki Tyler appeared in the meeting room and stated that her husband was unable to reach the second floor.  The City Commission offered to accommodate Mr. Tyler by giving him access to a room on the first floor where he could watch the proceedings on television.  They also offered to provide a "runner" to communicate his concerns to the Commission, or to allow enough time to allow Vicki Tyler to do so.

44.  The Commission's offers to accommodate plaintiff were rejected.  The City Commission decided to proceed with the meeting, but with an abbreviated agenda.  The Commission delayed action on several agenda items until the following week, when a special meeting was held to complete the agenda.

45.  No effort was made to relocate the abbreviated meeting to a room on the first floor of City Hall in order to allow plaintiff to attend.  Plaintiff had specifically requested that the meeting be relocated to the city auditorium located in an attached building, which would have been accessible to him.

46.  At the City Commission meeting held in mid-November 1992, plaintiff asked whether the City had a plan for evacuating persons who are disabled from city buildings in the event of fire.  On December 2, 1992, Mayor Richard W. Seidler responded by letter, explaining the evacuation procedures and enclosing a memorandum from the City's Director of Fire Services, prepared at the Mayor's request.

14

AO 72A

47. In December 1992, Mr. Pearson appointed Ron Fehr as his Assistant City Manager. On March 14, 1993, Ron Fehr was designated the new contact person regarding ADA compliance, replacing Cornell Mayfield. An internal ADA Committee made up primarily of city supervisory personnel was established to review ongoing efforts by the City to insure compliance with the ADA.

48. The City of Manhattan has responsibility over streets and walkways. On December 17, 1992, the City established a policy regarding the construction of new sidewalk curb ramps and replacement of existing curb ramps. The policy applies to all new construction undertaken by the City. Essentially, the policy provides that all newly constructed or altered sidewalks within the City's statutory responsibility are to contain curb ramps that comply with the Uniform Federal Accessibility Standards (UFAS).[4] The policy also designates the city offices responsible for ensuring implementation of the policy.

49. The City has identified the curb ramps that need to be installed at each street intersection. Priority has been assigned to curb ramps adjacent to government facilities, such as city buildings and schools. However, the City has not adopted a schedule for the installation of curb ramps.

50. In late October 1992, the City solicited bids from architectural firms to oversee and implement the ADA transition plan and to remove architectural barriers at City facilities. On December 7, 1992, representatives of six architectural firms were

---

[4]    See 41 C.F.R. Part 101-19.6, Appendix A, § 4.7.

15

interviewed by a selection committee, which included representatives of the ADA Committee. The selection committee recommended the Ken Ebert Design Group because of its past experience with similar barrier removal projects. The City Commission authorized a contract with the firm on December 15, 1992, and successful contract negotiations ensued, culminating in a contract signed on February 8, 1993.

51. The architect selected was provided a copy of the transition plan as approved by the ADA Committee. The firm was asked to perform an overall assessment of city facilities and identify any necessary modifications omitted from the transition plan. However, the contract explicitly excluded the preparation of a written assessment document.

52. On February 9, 1993, plaintiff filed his complaint initiating this action.

53. The architect reviewed city facilities and identified additional modifications necessary to comply with the ADA. The scope of the project was adjusted accordingly. The applicable standards for accessibility of buildings and facilities under the ADA, known as the Americans with Disabilities Act Accessibility Guidelines ("ADAAG"), were employed by the architect in reviewing the City's facilities.[5]

54. The architectural firm developed a preliminary list of prioritized improvements and presented it to the ADA Committee on

---

[5]     The Guidelines are published at 28 C.F.R. Pt. 36, App. A, and in the Appendix to 36 C.F.R. Part 1191.

April 28, 1993.    The ADA Committee provided input on the prioritization of the modifications in the event that insufficient funds were available to complete all of the listed modifications. At this meeting, city facilities were categorized into three groups, with highest priority placed on making all required modifications to City Hall offices, City Auditorium, the city's Senior Center, the public library, the fire station headquarters, the City Park swimming pool, and the Douglass Center Annex. Improvements to Sunset Zoo and the CiCo Park ball fields were placed in the second category of priority.    The third and last priority category included improvements to Griffith Park and certain other recreational facilities.

55.    Bids were accepted for each of the three categories of facilities after the City determined which of the necessary modifications could be accomplished by City personnel.    Bids were taken for the first group of facilities on September 8, 1993; for the second group of facilities on December 17, 1993; and for the third category of facilities on March 1, 1994.    In addition, the city internally developed specifications for a new entrance ramp at Sunset Zoo, and bids on that project were received February 2, 1994.

56.    On June 16-17, 1993, the City of Manhattan provided a half day of training to the majority of its employees concerning compliance with the ADA.    Specifically, employees were trained how to communicate with and provide services to individuals with varying kinds of disabilities.

17

57.   The front entrance to City Hall is not accessible to wheelchair users.   No handicapped parking has been designated at the front entrance to City Hall. However, the primary entrance to Manhattan City Hall is at the rear of the facility adjacent to the parking area.   The primary entrance to City Hall is wheelchair-accessible.   Plaintiff asked City officials to modify the front entrance to permit him access through the front door of City Hall. His request was denied.

58.   Plaintiff complained on several occasions to the City about an inadequate number of handicapped-accessible parking spaces at City Hall.   Until recently, the parking lot at City Hall designated only one parking space as handicapped-accessible, of a total of 66 parking spaces.   Approximately three weeks prior to the trial in this matter, the City Commission voted to provide one additional permanent parking space, for a total of two.   In addition, the Commission decided to add two temporary handicapped parking spaces during City Commission meetings.

59.   However, the plaintiff considers the new permanent parking space to be inadequate because the pavement striping is actually on the sidewalk, which requires the plaintiff to park on the sidewalk in order to have sufficient space to exit and reenter his van.   In addition, the plaintiff has been inconvenienced when he had to leave in the middle of a meeting to run an errand, because the temporary handicapped parking signs had been removed before he returned to the meeting.

18

AO 72A

60.    Plaintiff expressed his general concerns about the inaccessibility of city recreational facilities to city officials on many occasions.  Specifically, plaintiff attended all but two of the meetings of the ADA Committee to express his concerns regarding the access problems the Tylers had identified.    Vicki Tyler attended these meetings with her husband.

61.    The Tylers told city officials orally that plaintiff wanted access to Warner Park, one of several city parks.  At Warner Park, signs mark a handicapped parking space in the parking lot. However, the road accessing the park from the parking lot is blocked by a large steel barricade.  Boulders border the parking area.    Between the barricade and the boulders is a space large enough to allow access to the park area by foot, but not wide enough to allow a wheelchair to pass through.    The City has not altered the entrance to Warner Park in response to plaintiff's request.  Nor is Warner Park's entrance identified for modification in the City's architectural barrier removal project.

62.    Plaintiff also told city officials that modifications needed to be made to two city ball fields, the Griffith Park West ball field and CiCo Park's Pluto ball field.  Plaintiff's children play baseball, and plaintiff regularly attends their baseball games.

63.    At Griffith Park West ball field, a sign designates a handicapped parking space, but the gravel parking area has no markings.  Plaintiff contends there is insufficient space to allow him to exit his car in his wheelchair.    Also, there is a grassy

19

area between the surrounding fence and the ball field that is difficult to negotiate by a person using a wheelchair.   In addition, the restroom facility at Griffith West ball field is inaccessible to persons using wheelchairs.

64.   Modifications to Griffith Park ball fields are identified in the third and final phase of the City's architectural barrier removal project.  Also, these modifications were listed in the ADA transition plan.  In the interim, the City has made no modification to its recreational programs to address the accessibility problems at Griffith West ball field.

65.   Pluto Field, located in CiCo Park, is surrounded by a low steel cable fence.  Plaintiff can access the field only if two other individuals stand on the cable to allow his wheelchair to pass over it.  Also, a hill leading down toward the field is too steep to allow safe wheelchair access.  While plaintiff can view the field from the top of the hill nearby, from that vantage point he is unable to interact with other spectators sitting in the stands.  Pluto Field has no restroom facilities whatsoever.

66.   James Pearson was aware of the architectural barriers at Pluto Field at the time the ADA transition plan was prepared. Pluto Field has not been identified in the City's architectural barrier removal project for any modifications.   The City has no plans to relocate the baseball games played at Pluto Field, or to implement any other programmatic changes to accommodate the plaintiff.

20

67.  CiCo Park has a total of five ball fields, including Pluto Field.  The other four ball fields, which are located in a four-plex, are accessible because of modifications the city made to the handicapped parking area to relocate it adjacent to a relatively level entrance gate.  Pluto Field is located in a separate area away from the four-plex, and its parking lot is on very steep terrain.  A ditch separates Pluto Field from the four-plex.  The City has been unable to identify how to modify Pluto Field to make it accessible, or whether the City has the means to do so.  It would be difficult, but not impossible, to reschedule or relocate the games presently scheduled to take place at Pluto Field.

68.  Plaintiff also enjoys watching tennis.  The City holds tennis tournaments at City Park and CiCo Park tennis courts.  The city's tennis courts at CiCo Park are inaccessible.  Steps lead down a hill to the CiCo Park tennis courts.  Plaintiff can get down the hill, but he cannot get back up in his wheelchair.  At City Park, until recently, a high solid curb divided the parking lot from the tennis courts.  Plaintiff discussed his concerns about the tennis courts' inaccessibility with city officials.

69.  Improvements have been made to the tennis courts at City Park.  The City has installed a handicapped parking area and a sidewalk leading from the paved parking area to the tennis court. The sidewalk provides direct wheelchair access to the tennis courts.  A viewing area has also been installed.  At the time of

21

AO 72A

trial, the City Park tennis courts were accessible. **However, the** tennis courts at CiCo Park were not.

70. As of June 1993, Sunset Zoo, a city-operated facility, did not have an accessible entrance because of a steep hill and steps leading down to the zoo exhibits. By the time of trial, however, the defendant was just completing the installation of an entrance ramp to allow wheelchair access to the zoo. **There** are also inaccessible hills preventing access to certain zoo exhibits. Not all of these internal barriers have been addressed at this time.

71. The City leases space in a private facility to house its Municipal Court operations. The lease was originally executed prior to the effective date of the ADA. There are no restrooms in the immediate vicinity of the Municipal Courtroom. The public restrooms on the main floor of the building are not accessible. An accessible restroom is located on the second floor of the building that may be accessed by an elevator. Because this restroom is used by various employees whose offices are in the building, each employee is issued a key for the restroom. If an individual using a wheelchair needs to use the restroom while in the building on Municipal Court business, he must therefore ask a Municipal Court employee to borrow a key.

72. The owner of the leased Municipal Court building has refused Ron Fehr's request to make the main floor restrooms accessible, and indicated that if public restrooms had to be made

22

accessible he would likely close all public restrooms in the building.

73. The Municipal Court facility is not addressed in the City's ADA transition plan. Nor was it evaluated by the City in 1992 for accessibility problems.

74. The City of Manhattan provides approximately $3.5 million per year to Riley County for the provision of law enforcement services. However, law enforcement services were not addressed in either the ADA transition plan or the self-evaluation.

75. The ADA Committee dissolved itself in May 1993, because it agreed that it had accomplished its charge. In September 1993, the City consolidated some of the functions that had been performed by the ADA Committee with the functions of the existing Human Relations Board, charged with hearing discrimination complaints concerning the City of Manhattan. The purpose of the reconstituted Human Rights and Services Board is to hear and resolve civil rights complaints and to serve in an advisory capacity with regard to civil rights issues. The Board has five members. Cornell Mayfield and Ron Fehr are assigned to serve as staff liaisons to the Board.

76. The City is in the process of implementing the modifications identified during the planning stage to remove architectural barriers in City-owned facilities, in accordance with the priorities set by the ADA Committee. The City anticipates that all modifications identified in the architectural barrier removal project will be substantially complete by September 1, 1994.

23

AO 72A

77.   The City continues to knowingly provide city programs and services in facilities identified in 1984 as having architectural barriers that deny access to persons with disabilities.   The City assumes that it may continue to do so until an individual with a disability makes the City aware of an specific accommodation that is necessary in order to permit that individual to participate in the particular service or activity offered at an inaccessible facility.   In the opinion of city officials, this approach allows the City to know how best to accommodate that individual's particular disability.

78.   No city official has made a determination that an alteration to any existing city facility would pose an undue burden to the city.[6]

79.   The City has made substantial progress toward achieving compliance with the requirements of Title II of the ADA.   Many of the steps undertaken by the City to do so, however, have occurred since February 9, 1993, when the plaintiff filed this action.

## CONCLUSIONS OF LAW

1.   The court has jurisdiction over this matter under the authority of 28 U.S.C. § 1331 and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., notwithstanding the fact that the plaintiff has not exhausted his administrative remedies.   See 28 C.F.R. Part 35, App. A, Subpart F (Compliance Procedures include private right of action for persons with

---

[6]     Nor is there any evidence that the City determined that any such alteration would fundamentally alter the nature of any service, program, or activity.   See 28 C.F.R. § 35.150(a)(3).

24

AO 72A

disabilities, who need not exhaust federal administrative remedies as a prerequisite); see also Gorsline v. State of Kansas, No. 93-4254-SAC, slip op. at 5 (D. Kan. March 4, 1994); Noland v. Wheatley, 835 F. Supp. 476, 482-83 (N.D. Ind. 1993); Petersen v. University of Wisconsin Bd. of Regents, 818 F. Supp. 1276, 1279-80 (W.D. Wis. 1993); cf. Pushkin v. Regents of Univ. of Colorado, 658 F.2d 1372, 1380-82 (10th Cir. 1981) (no exhaustion of remedies prerequisite for filing suit to enforce § 504 of the Rehabilitation Act, 29 U.S.C. § 794).

2.  Plaintiff Toby Tyler is a qualified individual with a disability as that term is defined in 42 U.S.C. § 12131(2).

3.  The City of Manhattan is a public entity as that term is defined in 42 U.S.C. § 12131(1), and it employs more than 50 persons.

### Self-Evaluation and Transition Plan

4.  Count I of the plaintiff's complaint alleges that the City of Manhattan has violated Title II of the ADA by failing to prepare and complete a self-evaluation as required by 28 C.F.R. § 35.105 and by failing to prepare and complete a transition plan as required by 28 C.F.R. § 35.150(d). The ADA itself does not require local governments to initiate self-evaluations or to adopt transition plans. The ADA, however, does direct the United States Attorney General to promulgate regulations to implement Part A of Title II of the ADA, which generally prohibits discrimination by

AO 72A

public entities against qualified individuals with disabilities.
See 42 U.S.C. § 12134(a).[7]

5. The regulations promulgated by the Department of Justice
to implement Part A of Title II ("Title II regulations") generally
require each public entity to conduct a "self-evaluation" as
follows:

**§ 35.105 Self-evaluation.**

(a) A public entity shall, within one year of the
effective date of this part, evaluate its current
services, policies, and practices, and the effects
thereof, that do not or may not meet the requirements of
this part and, to the extent modification of any such
services, policies, and practices is required, the public
entity shall proceed to make the necessary modifications.

(b) A public entity shall provide an opportunity to
interested persons, including individuals with dis-
abilities or organizations representing individuals with
disabilities, to participate in the self-evaluation
process by submitting comments.

(c) A public entity that employs 50 or more persons
shall, for at least three years following completion of
the self-evaluation, maintain on file and make available
for public inspection:

(1) A list of the interested persons
consulted;

(2) A description of areas examined and any
problems identified;

(3) A description of any modifications made.

(d) If a public entity has already complied with
the self-evaluation requirement of a regulation

---

[7] Those regulations must be generally consistent with those
applicable to recipients of federal financial assistance under §
504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. With
regard to program accessibility of existing facilities and
communications, the regulations must be consistent with those
applicable to federally conducted activities under 29 U.S.C. § 794.
See 42 U.S.C. § 12134(b).

implementing section 504 of the Rehabilitation Act of 1973, then the requirements of this section shall apply only to those policies and practices that were not included in the previous self-evaluation.

6. The public entity has the burden of establishing the extent to which the requirements of 28 C.F.R. § 35.105 are met by any self-evaluation it may have conducted for purposes of implementing § 504 of the Rehabilitation Act of 1973. To the extent that any of the public entity's current services, policies, and practices were not included in any such prior self-evaluation, they must be addressed in a new self-evaluation as required by § 35.105(a)-(c).

7. Pursuant to 28 C.F.R. § 35.150(a)(1), a public entity need not necessarily make each of its existing facilities accessible. However, each of the entity's services, programs, and activities must be operated so that, when viewed in its entirety, it is readily accessible to and usable by individuals with disabilities. 28 C.F.R. § 35.150(a). This mandate may be met by a variety of means, which may not necessarily include structural changes in existing facilities. See 28 C.F.R. § 35.150(b)(1); see also Kinney v. Yerusalim, 812 F. Supp. 547, 548-49 (E.D. Pa. 1993); aff'd, 9 F.3d 1067 (3d Cir. 1993), cert. denied sub nom. Hoskins v. Kinney, 114 S. Ct. 1545 (1994). For example, a public entity may comply with the accessibility requirement by relocating services to accessible buildings, by constructing new facilities, or by delivering services by assigning aides to program beneficiaries. The regulations expressly provide that an entity need not make structural changes in existing facilities "where other methods are

27

effective in achieving compliance with this section." 28 C.F.R. §
35.150(b)(1).

8. If a public entity elects to make such structural changes
in existing facilities in order to achieve compliance, however, and
if it employs 50 or more persons, it must develop a "transition
plan" setting forth the steps necessary to complete such changes.
28 C.F.R. § 35.150(d). The regulation sets forth the following
requirements for the transition plan:

> (d) *Transition Plan*. (1) In the event that
> structural changes to facilities will be undertaken to
> achieve program accessibility, a public entity that
> employs 50 or more persons shall develop, within six
> months of January 26, 1992, a transition plan setting
> forth the steps necessary to complete such changes. A
> public entity shall provide an opportunity to interested
> persons, including individuals with disabilities or
> organizations representing individuals with disabilities,
> to participate in the development of the transition plan
> by submitting comments. A copy of the transition plan
> shall be made available for public inspection.
>
> (2) If a public entity has responsibility or
> authority over streets, roads, or walkways, its
> transition plan shall include a schedule for providing
> curb ramps or other sloped areas where pedestrian walks
> cross curbs, giving priority to walkways serving entities
> covered by the Act, including State and local government
> offices and facilities, transportation, places of public
> accommodation, and employers, followed by walkways
> serving other areas.
>
> (3) The plan shall, at a minimum--
>
> (i) Identify physical obstacles in the
> public entity's facilities that limit the
> accessibility of its programs or activities to
> individuals with disabilities;
>
> (ii) Describe in detail the methods that will
> be used to make the facilities accessible;
>
> (iii) Specify the schedule for taking the
> steps necessary to achieve compliance with this
> section and, if the time period of the transition

28

plan is longer than one year, identify steps that will be taken during each year of the transition period; and

(iv) Indicate the official responsible for implementation of the plan.[8]

(4) If a public entity has already complied with the transition plan requirement of a Federal agency regulation implementing section 504 of the Rehabilitation Act of 1973, then the requirements of this paragraph (d) shall apply only to those policies and practices that were not included in the previous transition plan.

9. The City of Manhattan's self-evaluation process in 1992 did not comply with 28 C.F.R. § 35.105. The City failed to evaluate each of its *current* services, policies, and practices to determine whether each of them meets the requirements of the Title II regulations. While the City directed its key employees to identify barriers for inclusion in the transition plan, the self-evaluation requirement is much broader in scope than the transition plan requirement, encompassing all current city services, policies, and practices, not just existing physical facilities.

10. The City relies exclusively upon the self-evaluation that it conducted in 1984 for purposes of complying with § 504 of the Rehabilitation Act of 1973, citing 28 C.F.R. § 35.105(d). However, the fact that the regulation does not require a public entity to re-evaluate services, policies, and practices that were evaluated in 1984 does not absolve the City from its responsibility to comprehensively evaluate its *present* set of services, policies, and

---

[8]     The City does not contend that its 1984 transition plan was sufficient to meet the Title II transition plan requirement.

29

procedures to ensure compliance with the regulations implementing Title II.[9]

11.   The self-evaluation requirement of the regulations is the starting point for public entities to ensure that their public services and practices in general, and not just their facilities, comply with the strictures of Title II.   The self-evaluation requirement is more central to the enforcement of the ADA than is the transition plan requirement, since it is broader in scope.   It addresses much more than simply the accessibility of existing physical facilities.

12.   The regulation specifically requires the public entity to involve interested persons by allowing them to submit comments on the self-evaluation process.  The value of this requirement is that the public officials responsible for conducting the self-evaluation will benefit from the input of the community of persons with disabilities, who are in the best position to identify problems with the entity's services, policies, and practices that limit their participation.  See 28 C.F.R. Pt. 35, App. A, § 35.105, ¶ 2. Although the City did invite public input regarding the transition

---

[9]      While the City did conduct what appears to have been a comprehensive self-evaluation in 1984 for purposes of complying with § 504 of the Rehabilitation Act of 1973, it has not established that all of its current services, policies and practices were included in the 1984 self-evaluation.  The evidence at trial did not include a complete list of services currently provided by the City of Manhattan.  Furthermore, § 504 applies only to programs supported by federal financial assistance.   In contrast, Title II of the ADA applies to all services, programs, and activities provided or made available by public entities.  See 28 C.F.R. § 35.102(a).

plan, that plan addressed only structural barriers in the physical facilities owned by the City of Manhattan. Therefore, the City of Manhattan has not complied with the regulation requiring the City to obtain the input of interested persons regarding the self-evaluation.

13. The City has adopted an "ADA Services and Programs Policy," consistent with the spirit of the ADA, under which the City addresses problems with services, policies, and procedures when identified as such by a particular individual with a disability. However, the regulations require more. The self-evaluation requirement imposes an affirmative duty on public entities to evaluate their own services, policies, and practices, in conjunction with input from interested persons, for the purpose of identifying problems and proceeding to correct them. While the City is to be commended for adopting its ADA policy and a grievance procedure, it is not enough for the City to adopt an approach of responding on an *ad hoc* basis to specific individual complaints. A public entity that simply adopts a policy of responding to individual complaints alleging violations of Title II has not gone far enough to affirmatively identify access problems with its services, policies, and practices, and proceed on its own to correct them, as required by the key language of 28 C.F.R. § 35.105(a).

14. The self-evaluation required by § 35.105(a) is not an end in itself. Rather, its purpose is to identify factors associated with a public entity's current services, policies, and practices

31

that pose barriers, whether structural or non-structural, to participation by persons with disabilities. The self-evaluation process is simply one of the methods required by the regulations for achieving the ultimate goal of Title II: ensuring that qualified persons with disabilities are not excluded from public services, programs, or activities on the basis of their disabilities. See 28 C.F.R. § 35.130(a).

15. The City has not complied with the requirement of 28 C.F.R. § 35.105(c)(1) that it maintain for public inspection a list of interested persons consulted in the self-evaluation process. Nor has the City complied with § 35.105(c)(2), which requires the City to maintain a description of areas examined in the self-evaluation and the problems identified. Finally, the City has not maintained for public inspection a description of any modifications made, as required by § 35.105(c)(3).

16. The City's transition plan complies only in part with the requirements of 28 C.F.R. § 35.150(d). The City did develop a plan generally setting forth the physical modifications it deemed necessary to comply with the Title II implementing regulations. The City also provided an opportunity to interested persons to participate in the development of the plan when it invited input from numerous organizations representing persons with disabilities at the public hearing on July 15, 1992. The transition plan does place priority on curb ramps on sidewalks providing access to public facilities and public accommodations, as generally required by 28 C.F.R. § 35.150(d)(2). However, the plan does not provide a

32

"schedule" for providing such curb ramps as required by the regulation. See Kinney v. Yerusalim, 9 F.3d 1067, 1071-72 (3d Cir. 1993) (Title II regulations give specific priority to installation of curb cuts, which must be completed by January 26, 1995), cert. denied sub nom. Hoskins v. Kinney, 114 S. Ct. 1545 (1994).

17. Furthermore, the transition plan adopted by the City's ADA Committee on July 15, 1992, does not describe "in detail" the methods to be undertaken to make the facilities identified in the plan accessible, see § 35.150(d)(3)(ii), and does not specify the schedule for taking steps necessary to achieve compliance with the regulation, see 28 C.F.R. § 35.150(d)(3)(iii). Also, although it is clear that the duration of the City's transition plan for achieving compliance exceeds one year, the plan fails to identify the steps to be taken during each year of the transition plan, as required by § 35.150(d)(3)(iii). Nor does the plan itself designate the public official, whether by name or by title, who is responsible for its implementation, as required by § 35.150(d) (3)(iv).[10]

18. The scope of the transition plan does not include some city facilities that were later identified by the City as requiring physical modifications in order to comply with the pertinent regulations. The court is of the opinion, however, that the self-evaluation and transition planning process must be sufficiently flexible to allow public entities to make such modifications as may

---

[10]     The individual preprinted forms making up the transition plan merely designate Mr. James Pearson, then Assistant City Manager, as the person who completed the forms.

33

be necessary during the course of achieving compliance with the regulations implementing Title II of the ADA.

19.  A public entity may not exclude a particular service, program, or activity from its self-evaluation and planning process solely on the basis that it is offered in a facility leased, rather than owned, by the public entity.  Nor may a public entity exclude from its self-evaluation and transition planning process a service, program, or activity it makes available to its citizens by providing significant financial assistance to another entity, whether the service is operated directly by another local government entity or by a private corporation.  See generally 28 C.F.R. § 35.130(b)(1), (b)(3).  The Title II regulations expressly apply to "all services, programs, and activities provided *or made available* by public entities."[11]  28 C.F.R. § 35.102 (emphasis added).  The City of Manhattan therefore has a responsibility to evaluate such programs as its law enforcement services, provided under the auspices of Riley County with substantial financial support from the city, and its Municipal Court operations, located in a building leased by the City, to ensure that they comply with the Title II regulations.

20.  The City's transition plan need not address modifications to existing physical facilities unless such structural modifications are necessary to render each of the City's services, programs, and activities accessible, *when viewed in its entirety.*

---

[11]    The only exception is public transportation covered by Subtitle B of Title II, which is not at issue in this case.  See 28 C.F.R. § 35.102(b).

See 28 C.F.R. § 35.150(a).  Therefore, the fact that a particular city facility is physically inaccessible does not necessarily mean it must be included in the transition plan.  Rather, it must be included only if the City determines that no other measures will be taken to ensure that a particular program, service, or activity is accessible, when viewed as a whole.

21.  The plaintiff has not demonstrated that the services, programs, and activities offered by the defendant in City Hall are inaccessible to or unusable by him by virtue of the fact that the front door's threshold does not permit wheelchair access.  Because the services, programs, and activities offered in City Hall have been rendered accessible to the plaintiff by altering the primary entrance at the rear of the building, adjacent to the parking lot where handicapped-accessible parking is located, the City was not required to include the front entrance to City Hall in its transition plan.  While the court understands the symbolic value the front door to City Hall holds for the plaintiff, the Title II regulations do not require the City to make it wheelchair-accessible, as long as the services, programs, and activities offered in City Hall are otherwise accessible to the plaintiff.

22.  In July 1992, the defendant's parks and recreation program, when viewed as a whole, was not wheelchair-accessible. Nevertheless, the City was required to include in its transition plan only the modifications necessary to render the program, when viewed as a whole, readily accessible to and usable by persons with disabilities.    The  transition  plan  does  include  several

35

modifications considered necessary for certain recreational facilities in City Park, the City Zoo (specifically the entrance), CiCo Park (including the ball fields), Northview Park, Anneberg Park, and Griffith Park. The plaintiff has not established that other specific structural modifications to city recreational facilities were necessary in order to make the parks and recreation program, when viewed in its entirety, accessible to and usable by persons with disabilities. Therefore, the plaintiff has not established that the transition plan is inadequate simply because it omits particular structural modifications to existing city recreational facilities that the plaintiff alleges are necessary, i.e., the entrance to Warner Park, the tennis courts at City Park and CiCo Park, and the Griffith Park West ball field.

23. The City has not demonstrated that the self-evaluation process conducted in 1984 for purposes of complying with § 504 of the Rehabilitation Act of 1973 was sufficient to comply with the self-evaluation requirement of 28 C.F.R. § 35.105. The materials submitted at trial designated as the 1984 self-evaluation do not indicate that the City conducted a comprehensive review of the City's services, policies, and practices. Only two services or programs offered by the City in 1984 were included in the 1984 self-evaluation, according to the documentation admitted into evidence at trial. Consequently, the City cannot rely solely upon the 1984 self-evaluation to comply with the mandate of § 35.105. Subsection (d) of § 35.105 only absolves the City of re-evaluating those *services, policies, and practices* that were included in the

36

1984 self-evaluation.  Since most of the materials submitted at trial as the 1984 self-evaluation relate to the physical accessibility of facilities, without relating the facilities to the services provided or made available by the City, the court cannot conclude that the City has complied with § 35.105.

### Discrimination Claims

24.  Count II alleges that the City subjected plaintiff to discrimination in a variety of ways in violation of Title II of the ADA.  Plaintiff's claim in Count II essentially alleges violations of 42 U.S.C. § 12132, which generally prohibits a public entity from excluding a qualified individual with a disability from services, programs, or activities of the public entity.  See also 28 C.F.R. § 35.130(a) (same).

25.  To establish a violation of Title II, plaintiff must show:

(1)  that he is a qualified individual with a disability;

(2)  that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and

(3)  that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.  Concerned Parents to Save Dreher Park Center v. City of West Palm Beach, 846 F. Supp. 986, 990 (S.D. Fla. 1994); cf. Pushkin v. Regents of University of Colorado, 658 F.2d 1372, 1385 (10th Cir. 1980) (setting forth similar criteria for § 504 claims).  The

37

prohibition of Title II applies to action that carries a discriminatory effect, regardless of the City's motive or intent. Concerned Parents to Save Dreher Park Center v. City of West Palm Beach, 1994 WL 227345, at *1 (S.D. Fla. May 26, 1994).

26. The plaintiff carries the burden of proof on a claim that he has been discriminated against on the basis of his disability. See Concerned Parents to Save Dreher Park Center, 846 F. Supp. at 990.

27. Plaintiff was physically unable to attend a meeting of the City Commission on November 3, 1992, because the elevator accessing the second floor of City Hall was not functioning at the time. The Commission, aware that the elevator was not working, altered its agenda for that meeting by rescheduling certain matters to a subsequent meeting, which the plaintiff attended. Nevertheless, the plaintiff was excluded by virtue of his disability from a public meeting of city officials, which is clearly prohibited by Title II. The City Commission has not persuaded the court that the matters addressed at the meeting were so time-sensitive that they could not have been deferred to a later date after the elevator was repaired. Nor has the City explained why it did not move the meeting to an accessible location, as the plaintiff specifically suggested at the time.

28. Plaintiff also contends he has been excluded from participation in the development of the ADA self-evaluation and transition plan. While it is true that plaintiff was unable to participate in the self-evaluation, it was not because plaintiff is

38

disabled, but rather that the City has essentially not conducted a self-evaluation for purposes of complying with Title II. Consequently, the plaintiff may have been effectively excluded from participation, but not because of his disability.

29. With regard to the transition plan, the evidence clearly shows that plaintiff attended nearly all of the meetings held by the ADA Committee, during which the draft transition plan was reviewed and finalized. Further, the record shows that he was invited to participate in the public hearing on the plan held July 15, 1992. The court therefore finds the plaintiff's claim of discrimination regarding his participation in the transition planning process to be without merit.

30. The plaintiff next argues that he has been denied the opportunity to file ADA grievances with the City because it has failed to allow the plaintiff to file such grievances in alternative formats. Based on the evidence admitted at trial concerning plaintiff's inability to read, the court assumes the plaintiff's claim is that the City's ADA grievance policy should be communicated in media other than print, and that the City's policy improperly requires a grievance to be submitted in writing.

31. 28 C.F.R. § 35.107(b) requires public entities that employ 50 or more persons to adopt and publish grievance procedures that provide for prompt and equitable resolution of complaints alleging violations of the Title II regulations. The City of Manhattan has adopted such a grievance procedure.

39

32. 28 C.F.R. § 35.160(b) generally requires a public entity to ensure that communications with persons with disabilities are as effective as those with other individuals. 28 C.F.R. § 35.163(a) requires a public entity to ensure that persons with impaired vision, such as the plaintiff in this case, can obtain information as to the existence and location of city services and activities, including the processing of ADA grievances. Consequently, the City is required to provide information regarding its ADA grievance procedure in alternative communication formats, and to accept and process ADA grievances submitted other than in writing.

33. Although the plaintiff did not file a grievance with the City, the court has not been persuaded that the City precluded the plaintiff from doing so because of his disability. The evidence in the record demonstrates that the plaintiff, albeit with the assistance of his wife, was able to file detailed written complaints with the Attorney General's Office regarding the lack of handicapped-accessible parking in the City. Plaintiff signed his own name to these complaints. Plaintiff's wife testified that they did not file a grievance after they learned that it would have to be submitted to Mr. Curtis Mayfield. The plaintiff has therefore not persuaded the court by a preponderance of the evidence that he was barred by the City of Manhattan from filing an ADA grievance because of his disability. Rather, the evidence leads the court to

40

AO 72A

conclude that plaintiff elected not to file a grievance with the City, and instead decided to pursue judicial relief.[12]

34.   The   plaintiff   next   contends   that   the   City   has discriminated against him on the basis of his physical disability because  of  physical  barriers  precluding  his  participation  in certain recreational events sponsored by the City.   In particular, plaintiff contended at trial that he was unable to pass through the entrance to Warner Park, attend his daughter's baseball games at Pluto ball field and Griffith Park West ball field, attend tennis tournaments held at CiCo Park and City Park courts, or readily view exhibits  at  the  City  zoo.    Each  of  the  recreational  events  or activities  cited  by  the  plaintiff  are  offered  by  the  City  at existing facilities, which are governed by 28 C.F.R. § 35.150.

35.   The effective date of Title II was January 26, 1992.   As of that date, the ADA prohibited the City from discriminating against a qualified person with a disability by reason of that disability.   See 42 U.S.C. § 12132.

36.   The City of Manhattan has discriminated against plaintiff in violation of Title II by excluding him from participating in

_____

[12]      The plaintiff's decision not to file a grievance with the City does not preclude him from seeking relief by other avenues. See 28 C.F.R. Part 35, Subpart F (seeking compliance by filing complaint with federal agencies); 28 C.F.R. Part 35, App. A, § 35.107, ¶ 3 (complainants to federal agency not required to exhaust public entity's grievance procedure before filing complaint); see also H.R. Rep. No. 485, 101st Cong., 2d Sess., at 98 (1990) (Committee does not intend that persons with disabilities need to exhaust federal administrative remedies before exercising their private right of action).

AO 72A

certain city recreational activities due to physical barriers impeding full access to wheelchair users.

37.   Nevertheless, the City has voluntarily and in good faith embarked upon a comprehensive project for the removal of most of the physical barriers identified at trial by the plaintiff.   The City anticipates that the barrier removal project will be completed by September 1994.

38.   Plaintiff also contends that he has been discriminated against because Municipal Airport Advisory Committee meetings have been held at restaurants that are physically inaccessible.   The court concludes that such meetings are City activities and therefore subject to Title II.   However, the Committee's meetings have been relocated in response to the plaintiff's request, and they are presently held in a restaurant that plaintiff admits is accessible.   Although plaintiff complains that the parking at the current meeting location is inadequate, the court cannot conclude from the evidence offered at trial on this point that the parking problem is so significant as to preclude plaintiff from fully participating in the committee meetings.   The court admonishes the City to resolve any parking problem that limits the plaintiff's ability to attend Municipal Airport Advisory Committee meetings, including any problems with parking egress.

39.   Plaintiff also argues that by failing to provide the City Council agenda packet on audiotape, the City has denied him equal participation in City Council meetings.   However, the court has not been persuaded by the plaintiff that the failure of the City to

42

provide the entire agenda packet on audiotape has hindered his ability to fully participate in City Council meetings.  The court nevertheless encourages the City to provide materials in the agenda packet in audiotape format if they are of widespread public interest, or if they are of particular interest to persons with disabilities.

40.  Plaintiff also asserts that the City has discriminated against him for failing to provide "equally accessible seating" at City Council meetings. At trial, plaintiff contended that his wife was unable to sit next to him at City Council meetings because of the configuration of the handicapped-accessible seating at such meetings.   However, the City's representatives testified in response that they would take steps to remedy this problem.   The court notes that this particular complaint was not preserved in the pretrial order, and therefore the court will not address it further.

41.  Finally, plaintiff contends that he has been denied equal access to restroom facilities at the City's Municipal Court building, because he is required to request a key in order to use the only accessible restroom.   The court agrees that this arrangement does not comport with Title II.   See generally 28 C.F.R. § 35.130(b).  Further, as noted previously, the fact that Municipal Court is housed in a leased facility does not absolve the City from its responsibility to ensure that it is accessible to and usable by qualified persons with disabilities.

43

## Relief

42.  To redress Count I, the plaintiff seeks a court order directing the City of Manhattan to conduct an appropriate self-evaluation and to develop an appropriate transition plan. Plaintiff also seeks an order directing the City to obtain appropriate technical assistance.

43.  With regard to Count II, plaintiff claimed compensatory damages for the mental anguish and humiliation he alleges resulted from the defendant's discriminatory conduct.   The court has previously determined that monetary damages are not recoverable under Title II of the ADA to redress mental anguish and humiliation.  See Tyler v. City of Manhattan, _____ F. Supp. _____, 1994 WL 150703, at *1 (D. Kan. April 20, 1994).  Consequently, the court permitted plaintiff to seek declaratory and injunctive relief on Count II in lieu of his claim for compensatory damages.

In his proposed conclusions of law regarding Count II (Doc. 62), plaintiff requests equitable relief in the form of a court order directing the City of Manhattan to (1) modify the Municipal Court policy of requiring persons with disabilities to request assistance to use the restroom, either by modifying the policy or removing the architectural barriers precluding access to the restrooms in that facility; and (2) review its recreational programs and modify policies as necessary, with special attention to baseball fields used by plaintiff's children, so as to ensure that plaintiff has equal access to parks and recreational events.

44

44. The relief sought by the plaintiff is a **mandatory** injunction, since it would disturb the status quo by ordering affirmative relief. See, e.g., Johnson v. Kay, 860 F.2d 529, 541 (2d Cir. 1988). The decision to grant or deny an injunction lies within the sound discretion of the district court. Prows v. Federal Bureau of Prisons, 981 F.2d 466, 468 (10th Cir. 1992) (citations omitted), cert. denied, 114 S. Ct. 98 (1993). The standard for granting mandatory injunctions is stricter than that applicable to a prohibitory injunction designed to preserve the status quo. Zurn Contractors, Inc. v. B.F. Goodrich Co., 685 F. Supp. 1172, 1181 (D. Kan. 1988). Mandatory injunctive relief should be granted only under compelling circumstances, because it is a harsh remedial process not favored by the courts. Citizens Concerned for Separation of Church and State v. City and County of Denver, 628 F.2d 1289, 1299 (10th Cir. 1980), cert. denied, 452 U.S. 963 (1981); Citizens for Environmental Quality v. United States, 731 F. Supp. 970, 996 (D. Colo. 1989). "[M]andatory injunctions are not granted in doubtful cases in which the facts and law do not clearly favor the moving party." American Carriers, Inc. v. Baytree Investors, Inc., 685 F. Supp. 800, 806 (D. Kan. 1988).

45. Under appropriate circumstances, the court may justifiably withhold injunctive relief even if it concludes that the law has been violated by the party sought to be enjoined. Prows, 981 F.2d at 468 (citations omitted). If a public entity makes dutiful progress to remedy asserted violations, whether or

45

not it is encouraged to do so by the pendency of a lawsuit, a federal court should exercise restraint. See <u>Morrow v. Harwell</u>, 768 F.2d 619, 626 (5th Cir. 1985). While a court may grant injunctive relief even though the allegedly unlawful conduct has abated, the moving party must satisfy the court that the relief is needed because there is some cognizable danger of recurrent violation. <u>Committee for First Amendment v. Campbell</u>, 962 F.2d 1517, 1525 (10th Cir. 1992).

46. The party seeking injunctive relief must demonstrate irreparable injury and the inadequacy of legal remedies. <u>Citizens for Environmental Quality</u>, 731 F. Supp. at 996. In considering whether to grant injunctive relief, the court must also balance the competing claims of injury and must consider the effect on each party of the granting or withholding of requested injunctive relief. <u>Id.</u>

47. In this case, the defendant has adopted an written policy expressing its intent to fully comply with the Americans with Disabilities Act. The defendant has also undertaken a comprehensive project to remove numerous architectural barriers in city buildings and recreational facilities, and has made substantial progress on its own to remedy many of the problems the plaintiff has assisted in identifying. These efforts are no less significant in their effect for having been initiated, at least in part, in response to the filing of this lawsuit.

48. After carefully considering the equities of this case and the applicable principles stated above, however, the court has

concluded that certain narrowly tailored injunctive relief is in order in this case.  Since monetary damages are not available to redress the Title II violations plaintiff has established, his remedy at law is inadequate.  Further, the court concludes that absent injunctive relief, the City of Manhattan is unlikely to achieve full compliance with the mandates of the Title II regulations.  This is not so much due to the City's unwillingness or lack of motivation to comply, but rather to a lack of understanding of its obligations under the Title II regulations. Therefore, the plaintiff is likely to suffer continued irreparable harm in the future as a result of being denied equal participation in city services, programs, and activities.

49.  Although the City has not fully complied with the self-evaluation requirement of 28 C.F.R. § 35.105 or the transition plan requirement of 28 C.F.R. § 35.150(d), the court concludes that the City has made a good faith effort to achieve at least partial compliance with Title II of the ADA by undertaking significant structural modifications to its existing facilities.  The court notes that the City expeditiously sought outside financial support for its architectural barrier removal project.  Further, it established an ADA Committee that met regularly for the purpose of providing input on the City's transition plan for modifying existing facilities to comply with Title II.  Assuming the City completes the structural modifications it has presently identified with the assistance of its contracting architect and engineers, the Court fully anticipates that the City's existing facilities will be

47

in substantial compliance with Title II by January 26, 1995.  The court urges the City to continue to complete these modifications as expeditiously as possible, as required by the regulations.

50.  In certain particulars, however, the City must take affirmative action to achieve full compliance with the regulations. Specifically, the City must adopt a schedule for installing necessary curb ramps in accordance with the priorities established by 28 C.F.R. § 35.150(d)(2).  The schedule must identify dates by which the City intends to install each of the curb ramps identified as necessary.  It is not enough for the City to rely on its routine street maintenance plan; the City must specifically adopt a schedule of dates to ensure that all curb ramps are installed as expeditiously as possible, but no later than January 26, 1995.  Cf. Kinney v. Yerusalim, 9 F.3d at 1072 (the fact that the City must install curb ramps when constructing new streets or altering existing ones is not negated by the existence of a transition plan for the installation of curb cuts on existing streets).

51.  The court is aware that one of the purposes of the self-evaluation requirement is to provide the City with a basis for decision making regarding the methods it elects to pursue to achieve compliance with Title II.  The City has already embarked on a comprehensive project for the removal of architectural barriers in many of its facilities.[13]   Having done so, it would serve no

---

[13]    The City's decision to adopt this approach may have been influenced by the availability of grant funding from the State of Kansas for the purpose of removing the architectural barriers. However, the court again emphasizes that architectural barriers in existing facilities need not necessarily be removed if there are

48

AO 72A

useful purpose to require the City to conduct an evaluation of its services, policies, and practices as they existed prior to July 26, 1992, the deadline imposed by the pertinent regulation for completing the self-evaluation.

52.   Consequently, the City is directed to conduct a self-evaluation, consistent with 28 C.F.R. § 35.105(a)-(c), of all of its services, practices, and policies as they exist on the date this memorandum and order is filed.   The evaluation must address all services made available by the city, including those offered in leased facilities and those provided by other entities with significant financial support provided by the City of Manhattan. It must also address the City's policies and practices, including communications practices, to identify nonstructural barriers to participation by persons with disabilities.[14]   If any problems identified in the self-evaluation will be corrected upon the completion of the City's ongoing architectural barrier removal project, the evaluation should so note, with specific reference to the project documents and the anticipated date of completion.   The City is admonished to invite input from interested persons,

_____

alternatives, perhaps less costly, of ensuring that the City's programs and services are accessible to persons with disabilities. As a corollary, just because the City removes architectural barriers in its existing facilities is not necessarily sufficient to achieve compliance with Title II, if non-structural impediments remain that limit the ability of a qualified person with disabilities from obtaining the benefit of a city service or program.

[14]     The court anticipates, for example, that the City will address the concerns plaintiff has pressed regarding the procedure for evacuating persons with disabilities from public buildings in the event of fire.

49

including the plaintiff, in completing this self-evaluation.  The City is also encouraged to seek technical assistance in performing its self-evaluation.  The City shall proceed expeditiously with the self-evaluation so as to allow adequate time to address any problems identified, keeping in mind that 28 C.F.R. § 35.105 directs the public entity to "proceed to make the necessary modifications" in the City's services, policies, and practices that do not meet the requirements of 28 C.F.R. Part 35.

53.  Because the City has voluntarily initiated modifications to many of its recreational facilities that will enable plaintiff access to the events he wishes to attend, the court declines to grant injunctive relief to the plaintiff requiring the City to make particular modifications already identified in the City's architectural barrier removal project.  The City is admonished to proceed as expeditiously as possible with the remaining modifications included in the project that are as yet uncompleted. If any further structural modifications are considered necessary following the self-evaluation to be conducted by the City, they should of course be completed as expeditiously as possible, but no later than January 26, 1995.

54.  The City's ongoing architectural barrier removal project does not address the admitted physical inaccessibility of the entrance to Warner Park and Pluto ball field.  The court concludes from the evidence that the ball games presently scheduled to be played at Pluto ball field can be relocated to other ball fields within the City of Manhattan that are presently accessible.  The

AO 72A

court also concludes that the steel barrier presently blocking wheelchair access to Warner Park could be readily altered or moved to allow wheelchair users enough space to pass through the entrance. The City of Manhattan is directed to relocate the ball games at Pluto Field within 30 days of the date of this order. The City is enjoined to make the physical modification to the Warner Park entrance as expeditiously as possible, consistent with 28 C.F.R. §35.150(c).

**IT IS BY THE COURT THEREFORE ORDERED** that the City of Manhattan is enjoined to adopt a schedule for installing curb ramps as required by 28 C.F.R. § 35.150(d)(2), including specific dates by which the City intends to install each curb ramp.

**IT IS FURTHER ORDERED** that the City of Manhattan shall complete forthwith a self-evaluation of its current services, policies, and practices as of the date of this order, consistent with the specific requirements of 28 C.F.R. § 35.105, except as modified by this memorandum and order.

**IT IS FURTHER ORDERED** that the City of Manhattan is enjoined to relocate any city-sponsored ball games presently scheduled to take place at Pluto Field in CiCo Park to other ball fields that are accessible to the plaintiff, within 30 days from the date of this order. The City is enjoined from subsequently offering any recreational program or activity at Pluto Field until such time, if any, as modifications are made to make it accessible to persons with disabilities.

51

AO 72A

**IT IS FURTHER ORDERED** that the City of Manhattan is enjoined to modify the steel barricade blocking the entrance to Warner Park to allow sufficient room for access to the park by persons using wheelchairs.  This modification shall be made as expeditiously as possible, but no later than January 26, 1995.

**IT IS FURTHER ORDERED** that the plaintiff shall proceed in accordance with Fed. R. Civ. P. 54(d)(2) and D. Kan. Rule 220 with regard to his request for statutory attorney's fees and costs.  <u>See</u> 28 C.F.R. § 35.175.

Dated this ___7___ day of July, 1994, at Topeka, Kansas.

DALE E. SAFFELS
United States District Judge

DES:JLG

52

AO 72A